of the County of Burlington. It is an honor to appear before this august body and your learned panel. With the Court's permission, I'd like to reserve two minutes of my time for rebuttal. That's granted, and it might turn out to be longer, as you've heard. I have some facts that I'd like to question about, if my colleagues will let me, because I'm really not sure that I understand all the facts. You represent the Burlington County Jail, but also, I guess, you know the facts with respect to Essex. I know them considerably less well than I know the facts of my own county, Your Honor. I'll apologize for that, but I certainly will help in any way I can. Does the jail have non-indictable offense prisoners as well as indictable offense prisoners? I can speak with absolute certainty that the Burlington County does, and almost absolute certainty that Essex has non-indictables and indictables as well. Okay, so how many non-indictables are we talking about? I can tell you that during the class period, the number of non-indictable offenders who were strip-searched is, I believe, in the area, and I can't give an exact count, but in the area of 5,000 prisoners. Well, let's take a year. Were there any non-indictables that weren't strip-searched? No, Your Honor. All people admitted to the general housing and population of the Burlington County Jail are strip-searched, irrespective of their status as indictable or non-indictable. And is there any facility within the jail where non-indictables can be held before they go into the general population? Well, generally, what happens is that they are placed in, when an inmate is placed into the jail, and this is not part of the record, so I want to be clear for that, because I don't think this has come up in the papers, but as long as Your Honor is asking, I will tell you that generally speaking, an inmate will be placed in a kind of a segregated area, although still within the general population of the jail. At some point in time, shortly thereafter, there is a classification committee that classifies each of the inmates for a particular housing wing, and those wings are, as I assume with all correctional facilities, tiered based on levels of offensiveness, violence, what have you. Now, if, as the district court held, you had to have reasonable suspicion before the non-indictables could be strip-searched, would it be your position that you can look at the papers that come with the prisoner and say, well, by classification, we will say those that have prior drug offenses, whether they're in, whether that's the offense at issue, we would have reasonable suspicion to strip-search, and those who have prior gun offenses, violent offenses, even though they come in on a non-indictable, would it be your position that there would be reasonable suspicion? Judge, let me make it clear. Our position is that under the Supreme Court's decision in Bell v. Wolfish, and as recently interpreted by the circuit courts in the 9th and the 11th, that that determination of reasonable suspicion is not required. Yeah, but Bell v. Wolfish was after the contact visit, and so let's put that. I mean, we do know that. I know what your answer is. But what I'm saying is the district court said you can't strip-search without reasonable suspicion, and what I'm trying to find out is, and then the other, your adversary says, well, you know, somebody who's in for contempt or didn't pay alimony or whatever the order of the jury, and I'm trying to see if there, frankly, if there is a divider. In other words, I think the, I'm going to ask her, but I think that, I just have to say, yeah, if this person has drug offenses, well, we can assume that there might be some So we'll say that category is reasonable suspicion. Would that be the Burlington County Jail's position? Judge, our position is flat out that we are not constitutionally required to make that decision. But the district court said you were. The district court said we were, but another district court in the state of New Jersey has said we're not. Okay, but we're dealing with what's before us now. Okay. And so please answer the question. If, yes, under certain holdings, including Judge Rodriguez's, which, again, we believe with all respect to be incorrect, yes, a person who has a violent history of crime, a person who has a history of drug-related offenses, and I believe, if I'm correct, a person who has been arrested and is being held on a drug-related or violence offense, the courts in some other cases have said that in and of itself would constitute reasonable suspicion. Now I can finally get to my question, which took a while. How many are left? How many non-indictable, how many prisoners who come in on non-indictable offenses that don't fall within those categories are there a year? Judge, I cannot tell you that. Not many, I assume. Actually, Judge, there are probably innumerous members of them. I think that the national statistics show that the red light. You can worry about the red light. Add 15 minutes, because I took most of this. Go ahead. Judge, if I can, and again, this is not part of the record, but as long as Your Honor has posed the question, I'd like to answer it to the best of my ability. Well, you're an expert. I mean, you represent the jail. Again, I just want to – I don't want to exceed the scope of the record, but as Your Honor is asking, I'm going to tell you. I believe that the records and the studies show nationally that roughly 80 to 90 percent of the people who are in jail are in on drug-related offenses. But there are numerous other people who get admitted to jail. There are people who get admitted on contempt citations. There are people who are admitted perhaps as a witness in a case who are being put in because they're a necessary witness and they don't want them to flee. And I might add that the MCC that was the subject of the Bell v. Wolfish case was a federal institution in New York that held indictable offenders, non-indictable offenders. It held people who were in a contempt of court, and it held people who were being held as material witnesses. And it remains, 30 years later, from that date to this day, the policy of the Federal Bureau of Prisons that all people placed into a federal institution will be searched not only after contact visits but upon initial admission. Strip searched? Strip searched and have a visual observation of all cavities, oral, anal, vaginal. And that remains the policy of the federal courts. If I were to be held by this court in contempt today and taken out of here down the street to the federal penitentiary, I would be strip searched. But you would make bail. I don't believe you can make bail on a contempt finding. Well, I don't know. But most people who are in jail, and this is to my amazement, before you get before a magistrate, I don't know how that happens under the Constitution. I thought I wrote an opinion that the Supreme Court agreed with. You have to take them, but that's in the federal system. You have to take them to a magistrate judge. This guy was held six days in jail. Six days, that's correct, Your Honor. And many people, in my experience, are held prior to a bail hearing, prior to an arraignment where bail may be addressed. But you also have a vast number of people in jail who are financially handicapped, and they can't make bail. I mean, it seems to you and I, perhaps, that we See, that's the problem. That may be one of the problems, and it isn't raised in the briefs. But I worried about that, which is that people who are put into the general population are people who don't have the money to make bail. Because if you can make bail, then you don't go into it until, you know, you're hurt. You don't go into the general population. So we're dealing with that substrate of society of poor people. Your Honor, that's an excellent point, and it is not something that's been addressed in most of the opinions. And what's very important, and I've read the circuit court opinions. Of course, I paid more attention to Powell. Powell, sure. It's all over your briefs. Yes, and Bull, because they're the most recent. I hope that they indicate a trend in circuit court thinking. But, Your Honor, none of the circuit courts really talked about the fact they mostly view this as a Davy versus Goliath, the individual versus the state. And that couldn't be further from the truth, because the vast majority of people whose protection will be afforded as a result of these strip searches are the inmates themselves. It's people like Mr. Florence who are not violent individuals who will be protected by strip searching those who may be. Because the vast amount of violence in a jail is not directed at the correctional staff. It's directed at other inmates. They have to deal with the intimidation of the gang members. They have to deal with the spread of infection from people admitted to the jail who don't even know they have MRSAs, and they get stabbed. Before we get to the health issue, one of the things that I'm wrestling with on the violence issue is we now have several years of searches done only based on reasonable suspicion. What evidence did you marshal below regarding weaponry that was brought into the prison under that framework? Your Honor, what I can tell you about that are several points. First and foremost, we had seven boxes of material that we were prepared to produce through discovery on strip searches and items that were found during the course of these strip searches. There were several months left of discovery, so it was an open discovery period. We had a conference before Judge Rodriguez. I told him that we were in the process or even had just filed our motion for summary judgment, but I told him I don't think it's fair to hold the summary judgment in the normal scheme of things because I'm about to produce seven boxes of material that Ms. Lask and her clients haven't had an opportunity to review. And quite frankly, I think we're going to need to extend the deadlines here because it's going to take them months to get through those boxes, as it did me. Then it's going to take them months to respond to those. And what Judge Rodriguez said is, Counsel, this is a legal issue. This is not relevant. The number of instances here and the nature of the instances on contraband that was found is not relevant to this case, so we're going to proceed on the legal issue. What was in the seven boxes? Judge, I can tell you that in the seven boxes there were numerous instances where both gang tattoos and affiliations, evidence of disease, and, in fact, weapons were found. I can point out to you. And drugs. Drugs. Frequently drugs, including, if you can believe this, glass crack pipes and hypodermic needles, lighters, packs of cigarettes, bags of marijuana, heroin, cocaine, brushes. It boggles the imagination to what people will attempt to secrete into a jail in their orifices. I can tell you of an incident. Again, this is not in the record, but I'm being asked. Very recently, within the last six months, Atlantic County, which stopped doing strip searches because it is one of the counties in New Jersey being sued right now. They are also, I believe, submitted an amicus brief on this. They had an inmate who was not strip searched. He was an extremely overweight individual. Fourteen hours after being admitted to the Atlantic County Correctional Facility, he was found to have secreted a firearm with two spare clips of ammunition into the jail in the rolls of fat on his person. Now, if that is not clear evidence that there is a problem if we do not strip search people, I don't know what is. But not all the jails in New Jersey strip search. Not all, but some. Many. Well. There are currently at least, I believe, six or eight of these class actions going on in the state of New Jersey. And there are class actions in the state of Pennsylvania or Commonwealth as well. That's probably a simple idea, doesn't it? Could we move from the evidence that's not in the record, but that you responded to because of questions, back to the case law doctrine that presumably governs this case one way or another? No. Bell v. Walfish is not this case to the extent that there was a process engaged in after people had had contact visits. It also contains that ambiguous phrase, less than probable cause, which Justice Powell construed to mean, I take it, nothing by way of suspicion. I know the Eleventh Circuit has pursued that analysis of the language. But if we array Judge Korn's opinion in the Eleventh Circuit against the dissent of Judge Parkett and look at the line of circuit court cases that have dealt with this issue, certainly the weight of those cases runs against your submission. I would concede that without question, Judge. The numbers are, I believe, 8 or 9 to 2 at the current time in terms of the circuit court precedent. What I would suggest to Your Honor is that if you read Bell, there is nothing in it to suggest that there is any requirement for reasonable suspicion. And I do agree with Judge Korn that Judge Powell, remember, this isn't a throwaway line in Judge Powell's dissent. Judge Powell's sole basis for his dissent, his dissent constituted three sentences, and the sole basis of that dissent, presumably made after he had sat in on the majority's deliberations, was my only disagreement with the majority is they don't require reasonable suspicion. If the majority had even spoken about it, why would he have bothered to dissent? And after his dissent was handed in to the majority, if the majority opinion had intended to include reasonable suspicion, Judge Rehnquist would have written, by the way, Judge Powell is mistaken. We always intended. I've seen that happen many times. Sotomayor You can't say that with any – that's speculation. Maybe three of the judges in the majority would have said that, maybe two of them would have. We have no idea. There are multifarious reasons why there was no rejoinder to Justice Powell's dissent on that issue. That is correct. I can only speak to what Justice Powell said and what I believe to be the obvious reason for that statement was. But I'm sorry. And I apologize. Doesn't – I don't know if you had a follow-up. Doesn't New Jersey NJAC 10A colon 31-8-4 prohibit strip searches for non-indictable offenses without reasonable suspicion? Well, first and foremost, Your Honor, the New Jersey – Excuse me. There's a yes or a no to that. Okay. It does, Your Honor. Okay. Now, in that same code, it also says that all admissions to an adult county correctional facility shall be strip searched. And that was noted by Judge Rodriguez in the district court opinion. There are flatly inconsistent provisions in the same administrative code provisions. And, of course, I remind this Court that just because the Attorney General says it so doesn't mean that it's constitutionally correct. That's true, but it's strikingly odd to me that you've got the Attorneys General and the prison administration at loggerheads on this. Can you shed any light on that? Your Honor, I am baffled by that, quite frankly. Not only am I familiar with those people, and I consider them to be giants in the legal field. Those are the former – the former Attorneys General. Yes. But I know Mr. DelTufo personally. He's a friend of my family. I was shocked when I saw – and I can't begin to imagine what their purpose was in issuing that position, but that is their position. But that's – This isn't some longstanding disagreement between the – one part of the executive and another part of the executive. Judge, when I heard that they were going to be offering an amicus brief, I was tickled pink. And when I found out what the basis of that was going to be, I was shocked silent. Yes, but they take the position, as you say, it's nine against two. The vast majority of decisions by the courts of appeals are of the – take the position that you can't strip search without reasonable suspicion. Your Honor, it is the foundation of our American system of justice, and I do not say this flippantly, that might does not make right. And I think if you read those decisions – and I truly believe that if you read Judge Acuda's decision out of the Ninth Circuit and Judge Powell's out of the Eleventh Circuit, they are clear, they are concise, and they are very well reasoned. And I cannot urge this Court enough that I believe, and I would submit to you, that Judge Acuda did not exaggerate in her concurring opinion in the initial decision out of the Ninth Circuit when she said if a court is to hold this policy of strip searching to be unconstitutional, it will put lives at risk. All right, but you've hit on something that's very important to me and perhaps to my colleagues. The Ninth Circuit case, there was a record – the San Francisco jail, according to that opinion, had a history of problems along the lines of what you've told us in response to a question were contained in seven boxes but are not in the record here. And we are not in the habit of deciding cases based on things not in the record. Should this case be remanded to Judge Rodriguez? Was he wrong when he said this is a legal issue? Should this go back so that you can make a record in the way that the record was made in the Bull case? I don't believe that remand is necessary, Your Honor, and I'll tell you why. You're correct that they did have an extensive record in that case. However, the Supreme Court and Bell felt no need for such a record. They dealt with a – But, again, we tell you that that was an after-contact case, and it's different. Your Honor, with all due respect, it's not different, because a contact – Well, there was no record in Bell. I'll grant you that. There was a single incident in Bell. There was one single incident, which, you know, that seems to indicate to me that's not much of a problem. No, no. When you contrast that with what happened in San Francisco, you've got radically disparate records, don't you? I would respond twofold. I would not suggest that I am – it would be appropriate for me to submit my thinking for Judge Rehnquist, but what he said is – Justice. Justice. I apologize. Justice Rehnquist – He would really correct – he would really say, Chief Justice – Oh, I know he would. I know he would. But what – what the Chief Justice said was, number one, a single incident is enough, but, two, and more importantly, perhaps the fact that there was only one is more than it is that there is an absence of a problem. So that's how I would respond to that. But, Judge, what I can tell you is there have been numerous other cases in the Federal Court system that have absolutely recognized as a matter of judicial fact that smuggling of contraband is a day-to-day problem and a security threat across the country. But that appeals, perhaps, to our common-sense notions of what happens in jails. It's not an evidentiary record. Maybe – maybe I should let go of my trial judge experience. But we decide cases based on evidence, not things that appeal to our common-sense notions of the fact that, quote, jails are dangerous places, unquote. But, Judge, there have been decisions after decisions by the Supreme Court, by circuit courts, by district courts, by state courts that have taken judicial recognition of the fact, and Bell, in fact, took recognition of the fact that the smuggling of contraband and the violence of the weapons occurs in correctional facilities, not this particular correctional facility, not those. And I would submit to this Court that there's no reason to believe that Burlington County Jail is the one jail in the entire country that doesn't have a problem. And what this Court in particular has taken notice of, the Third Circuit, in the phrase matter, was that gangs and gang violence in jails is a day-to-day concern in the state of New Jersey penal institutions. This Court said that in phrase. And they, in fact, went so far as to say – But once a court says that, that doesn't become calcified in time so that five, 10, 35 years later, a subsequent panel of this Court takes it as historic fact. Judge. We still have to put witnesses on the stand to testify, yes, my name is so-and-so. I'm an expert in prison administration. I've been involved in it for 20 years. And I can tell you, as a matter of fact, that gangs are a problem. I mean, that doesn't take more than a half an hour to put in that kind of evidence. Your Honor, if you would look at – or if you have looked at exhibits on Burlington County's appendix, number 15 through 20, they talk specifically about the issue of gang violence. They talk very – and they talk about it currently, not in the past tense. They speak about the fact that the – one of the easiest and most accurate ways to identify a gang member, which is a raging problem in New Jersey penal institutions, is through the use of both body markings and tattoos. And this Court, in phrase, talked about the Holvey report and statistics that were done by the New Jersey Department of Corrections. And this Court recognized that there are problems ongoing with gangs in New Jersey. And one of the easiest ways to identify their members is through their tattoos, their brands, and their body markings. Well, how could you have – I just have to ask you, how could you have the tattoos in the box when you say – when you tell us that they're on private parts of the people's bodies? Pardon me, Your Honor. I'm sorry. I was amazed when I asked you what was in the box. I said tattoos. You said tattoos. I'm assuming they're pictures of tattoos. Yes. Oh, okay. I wondered about that. Late last – I can't find my notes, but late last night as I was reading through these briefs, and I can't find the notes. And, Your Honor, I apologize for interrupting, but also there are sketches that are done upon admission that show where tattoos will be, and I'll represent to the Court.  I will accept that. Some of them are on the buttocks. That's as far as I'll go. Oh, yes. I didn't want to go farther than that. No. No, ma'am. No, Your Honor. But somewhere I read late, late last night, and I can't find my notes because it was really late, that there are – there's a kind of chair that you can put – Boss chair. Boss chair. I don't know. It's called boss. The boss chair, and there's something else you can do short of a strip search that will – this will give some indication of what they have. Can you tell us about that? I – honestly, Judge, I'm not terribly familiar with the technology. What I can tell you is – and, again, I hate to keep going back to this. But you're their lawyer. Well, I know I'm a lawyer, but I'm also not an expert in security procedures. I mean, you're the lawyer for the jail. I understand that, Judge. We don't employ the boss chairs. We use strip searches. Maybe that's the Essex. All right. I'll ask Essex. But what I can tell you is – You're all Essex. – that the Supreme Court in Bell very specifically said we don't have to look for lesser alternatives. This is one that works, it's effective, and it's easily effective. What I can also tell you, Judge, is – Yeah, but isn't it important whether there is an effective, less intrusive way to get to the – I mean, isn't it relevant? Not under the Supreme Court analysis in Bell, Judge. What they said is we are doing the analysis, and if you weigh the security of the jail, those concerns, against the rights of the inmates, and the Supreme Court – But Turner says it's important. Okay, but Turner – But you don't want to apply Turner. We've got a split in the Ninth and Eleventh. One applies Turner and one doesn't. I'm fine with that, because what the Eleventh said was – I apologize. The Ninth said was whether you apply Bull or Bell or Turner. Because the Ninth said Turner's more favorable to the prisons. That's right. And still the Ninth Circuit, and I think Judge Akuta, in a well-reasoned and certainly lengthy dissertation on the topic, found that all four of the Turner steps were well satisfied by the use of strip searches. And these are people where alternative lesser means were submitted to these jurists. And the Ninth said we don't have to. I apologize. Mr. DiGiornano, I just realized that we've given you all the time, but that the Essex County lawyer also wants to speak, and I think we have to hear from him. Is that all right? Your Honor, we had agreed previously to an eight-and-seven-minute split. But I was just answering questions. No, I understand that. And not in a brief way. Go ahead. Judge Pollack has a question. This may sound as if I have only an antiquarian interest, but if we can go back to the Supreme Justice that's always been in dispute, we deal here with the question whether visual body cavity inspections as contemplated by the MCC rule can ever be conducted on less than probable cause. So we have ambiguity as to whether less than probable cause means no cause or some lesser degree, such as reasonable suspicion. But I suggest to you that maybe we've been focusing on the wrong part of that sentence. The question, according to Chief Justice Rehnquist, is whether inspections as contemplated by the MCC rules can ever, underscored, courts underscoring, not ours, ever be conducted on less than probable cause. So the address was covering situations in which the categories of persons charged with drug offenses or whatever. So it covers the entire universe of statements. And certainly that it's consistent with the less than probable cause to say, well, there nothing's what he's charged with and there's criminal record and all. But that hardly takes into account the non-indictable offense where arguably one would need some level of suspicion. Your Honor, I hate to seem as if I am a marketing executive for Judge Carnes out of the Ninth Circuit, but I would take the same view on that issue as he has, because the ever issue, as they call it sometimes, has been discussed by other courts. And what I would suggest, as Judge Carnes did, is that you need to look at it in the context of the immediately preceding paragraphs of Bell. And remember that Bell was only they dealt with this entire issue in three paragraphs of a decision. But the preceding paragraph, or at least the beginning of the paragraph where they used the word ever, they talked about the fact that we assume that there will be instances where these searches will be held in abusive manners, where the guards will act appropriately. And they said, but we are not dealing with those situations. We are dealing with whether a strip search may ever be done. And I think if you view it in that context, what they meant by ever was a strip search can be done without reasonable suspicion as long as it's done professionally in a non-abusive manner. Thank you very much. Thank you, Your Honor. I appreciate it. It was an honor. I do apologize to Mr. Ruddy. I had forgotten that there was a division and that we want to hear from the Essex County Correctional Facility. May it please the Court, Your Honors. I would like to reserve. I'm sure you're going to ask me questions beyond my time. No. We can't have two reservations from the same side. Okay. Sorry. I know, Your Honors, we're asking questions. I know you might want to ask me about Essex County. Just tell us about what the Essex County Facility does. Well, the Essex County Facility has different procedures. And even though Judge Rodriguez granted summary judgment, the plaintiff in this case, Essex County did not admit. In other words, I believe the evidence shows that there wasn't strip search being done at Essex County. What evidence? This is an OP6 case. Well, there was four Essex County employees, including three superiors, who testified. And it's in the record, Your Honor. And they all said they don't do strip searches. And they gave a detailed description of what happens. They described what has been labeled in other cases a clothing exchange, as in But for the purposes of this appeal, Your Honor, since Judge Rodriguez factually ruled that strip searches did take place in Essex County, it's our position that under the Constitution, the institution has the right to conduct a strip search without reasonable suspicion. But is it your position that the practice in Essex County is to have the intake prisoners change their clothes and get naked within the eyesight of some jail employees, but not stand up, hold their arms out, turn around, and all that? That's correct, Your Honor. That's correct, Your Honor. That's what the evidence shows. On the other hand, Your Honor, plaintiff has said in his deposition That's right. He went to Essex. Yes. But, Your Honor, if I might interrupt myself. Sure. Go ahead. Interrupt yourself. I think there's also a fundamental distinction between Burlington and Essex in one major respect. In Burlington, he came in, and he was in Burlington for six days, and he was And I believe that if you analogize the situation, it's more akin to the Bell situation than Burlington. I think Burlington has reasonable cause also for what they did, but I think the Essex County situation is different. And I said in my brief, and this applies to both institutions, we're not immediate jurisdictional institutions in that we're not police stations. By and large, our people do not charge people with crimes, and they come immediately to our institutions. Usually they come to our institutions when there's a warrant, when there's some other major action that comes to the institution. Do you have indictable prisoners in the – as I understand it first, Essex County Jail is bigger than the Burlington County Jail. Yes, Your Honor. Not only is it bigger than Burlington, it's a lot bigger than the Bell MCC institution. As I read it, MCCC had about 500 people, inmates in it, and we have about 2,000 in our institution. And how many come in each year? 25,000, Your Honor. 25,000? Yes, Your Honor. And also, to make everything even more complicated, we get people from that Our jail is a major – it's the largest institution in the State of New Jersey, and as our deputy warden said, it's the most dangerous jail, and it has a lot of contraband within its institutions. You have – and you have in your general population prisoners who are there for indictable offenses as well as non-indictable. Yes, Your Honor. But I know Your Honor was asking about the immediate procedure. Yes. I think it is important to know the facts about the immediate procedure. Sure. The immediate procedure is there's an intake process, and then we have the procedure where we're here, the observation, the shower, then the inmate goes into prison garb. And then in our jail, they're also in quarantine for three days, Your Honor. Within the three days, there's also other things that happen. But all the people – Well, where do they go when they're in quarantine? Well, there's one general area. There's one general area, Your Honor. They're not in the immediate jail because there's a tuberculosis type of problem. So for three days, they're in quarantine, Your Honor. Now, wouldn't they catch – and then they are – at some point early, they're seen by a nurse or a medical person, right? Yes, Your Honor. Wouldn't that person catch the MRSA situation? Well, one of the reasons why our brief – I didn't mention the MRSA because we do have a pretty prompt procedure where most inmates go to the medical person. But in terms – another question that Your Honor asked in terms of bail and in terms of what type of person, according to the New Jersey court rules, a person has 72 hours when they get into our institution to have a bail proceeding, Your Honor. And usually, they should have had a bail proceeding in the local institution. The requirements are 24 hours. But when they come into our institution, there's a requirement of 72 hours. There is nothing in the record as to how many people are just there for bail or not bail, Your Honor. A lot of our people are in there because there's warrants already, Your Honor, contempt, other type of warrants, Your Honor. I noticed that in 2007, there were 14 instances of inmates found with contraband during intake in your jail. That's just an intake. Right. But then – Let me finish though. Oh, I'm sorry, Your Honor. Apropos of what I was asking your co-counsel there, should this be remanded for an evidentiary hearing? Do we have a sufficient record like the Ninth Circuit had in Bull? I think there's a sufficient record, Your Honor, for a couple reasons. One reason is we have Deputy Warden Pringle who said not only at the intake point but sometimes at the intake point because they're not doing the strip search unless you have reasonable suspicion. They're not doing it. So later on in the process, a lot of contraband is found, Your Honor. Well, during what process? Is this when they get out of the jail? Well, later in the jail. Later when people are in the jail, contraband is found. That's not an issue here though. No, but – Here we're dealing with strip search at intake. No, but it has to do with if you go back to – You didn't do a very good search at the beginning. Well, that raises other questions like are weapons coming in through people employed in the prison system and are you strip searching them? We're not strip searching them. They go through a metal detector. Everybody goes through a metal detector. So if you have a contraband problem with employees of the jail bringing in marijuana or other drugs, your metal detector is not going to do a lot to help with that. Not for the weapons. And I know Your Honor asked about the boss chair and what that was. Yeah, because I read about it last night. It's another layer of detection. It doesn't – it's not a foolproof method and it also – Does everybody sit on that chair? Yes, you sit on the chair. You sit on the chair before – and when do they sit on the chair? Well, they sit on the chair, as far as I know, before the intake process. It's early on in the intake and it's – they go to the metal detector for – where prisoners are for three days before they ever go into the general population. That's what I was just explaining, Your Honor. Yeah. But they're – everybody that comes in, whether you're a murderer, whether you have a serious – a person who might have reasonable suspicion for us to strip search, they're in this quarantine area, Your Honor. They're all mixed. So effectively, from day one, they're in the general population. Your Honor, if I might go back – Yeah, your red light is on. Oh. We have a long case this afternoon. I'm sorry. And he took most of your time. I'm sorry. So – Can I just say one thing? Yes. Just one little fact. Sure. Go ahead. I think everybody in this case – I know there's lengthy briefs and everybody's looked at them. There's five amici briefs. That's right. And there's many, many cases. But I think an interesting way to look at this case, and I put it in my reply brief, but I think it bears repeating. The decision in Bell was by Justice Rehnquist. And Justice Rehnquist, in the Logan case, just two years after, said, my colleagues are misinterpreting Bell. He had in Logan, Your Honor, a DWI case, a so-called minor detainee, which would be in our class in the Logan case. And he said, no, they're not correct. And his colleagues disagreed. Or at least his colleagues didn't feel strongly enough to take up the case, and they vacated his stay. Well, they vacated his stay, but I'm just saying for that, we have that type. And it goes along with – Thank you very much. Thank you. I'm sorry, but we could spend all day on this case, which is why I asked. We already have. Which is one of the reasons why I thought Mr. Marichle would find it of interest. Okay. Okay. May it please the Court, Your Honors, my name is Susan Hanna-Lask for the appellees. And I'm going to quickly go into this thing about the seven boxes. I remember that. That was a phone call, and that was after three years of this case. We're in our fifth year, okay, being here today. So there was no – they had three years to submit these boxes. They didn't. I don't believe they exist, or I don't know. You know, I don't care what's in there because it doesn't even matter. It's not before us. Okay, fine. What we have before us is a legal decision by Judge Rodriguez. On the evidence before him. And there was no proof. Well, it wasn't – all right, go ahead. It was really on the complaint before him. It's a summary judgment. Oh, it's a summary judgment. Yes, Your Honor, and on the summary judgment, they had the burden of, you know, refuting what we had said, which – Why shouldn't – pick up Judge Hardiman's question. Why shouldn't we send this back for further analysis of the facts? What was found? How dangerous is it really? Because they had three years to produce it, and they didn't. And I'll tell you about Essex. First of all, Essex doesn't even – I did the depositions. Essex doesn't even fill out the forms. I've asked – there's no – What forms are we talking about? Okay, Your Honor. The attorney – in discovery, I asked them, what guidelines do you follow for strip searches? They produced the attorney general guidelines. They produced the New Jersey statute that you spoke of earlier, and they produced their own internal documents, rules and regulations. Like Burlington has 1186, and, you know, they have their own names, their own memos. And they give a procedure. Do not strip search non-indictables unless you have reasonable suspicion, and then do it only when you have a supervisor there to check it off and fill out a form, a strip search form. Was there reasonable suspicion? You check it off. Why? You fill it out. So what's your problem with that policy? It's a great policy. My problem is they don't follow it, so they're not going to be able to produce anything. Well, your client claims it wasn't followed in his case, but you're not bringing an as-applied challenge. This is a class action. Yes. We have to look at the policies as they facially exist, not as they were implicated in any particular case. The point I was trying to make, Your Honor, is when Judge Sloviter asked, you know, should we remand it, there's no reason. Essex doesn't even have forms to produce. They didn't they don't. In depositions, they admit that they don't fill out the forms. In Florence's case ---- But if Essex's policy, this is this case is strange on so many levels, to me anyway. If Essex's policy is we only strip search if there's reasonable suspicion, you don't have a problem with that policy as written, correct? Right. But they do ---- But Burlington, their policy is otherwise, right? Burlington's policy is they will strip search everybody. No, Your Honor. I'm sorry if I might have confused you. They have a de facto policy. Who's they? Both prisons. Okay. Produce documents saying we will not strip search non-indictables unless we have reasonable suspicion and we will follow these procedures to do it. But they don't follow their own rules and regulations. Well, but Burlington's counsels conceded that. I mean, Burlington counsel stood up here and said they strip search everyone. Everybody. Essex's counsel says they don't. They require reasonable suspicion. And that's wrong. Essex uses semantics. What they try and say is it's a clothing exchange or it's a visual observation. They do strip search everybody. In the record, every one of their officers and their warden states specifically, and Judge Rodriguez's decision tracks that, that they do strip search. They're telling everybody to take off their clothes. It's just ---- You may define strip search differently, which we've discovered. But you're feeling, you're arguing, I gather, that the visual, what they call visual observation during a clothing exchange is equivalent to a strip search. Is that right? It is a strip search. It's more than that. They make them squat and cough. They make them turn around. They are stripped naked. In Essex. In Essex, in a group. Does Essex do a body cavity inspection? It's defined as a body cavity inspection when you spread your cheeks and they're looking in. That's the law. And that's what they do. Three to five men at a time stripped, or women, in a room that's about as big as this room, with people walking in and out, no privacy, and not just the guard in front telling them to strip, but other guards and other people present. It's a strip search with no privacy. It doesn't follow any of the Bell four factors. But you're saying, again, I'm sorry to focus on this, but I'm trying to ascertain whether we're dealing with a facial challenge to the rules as written. I take it you're not. No, the rules are. You're dealing with a class action facial challenge to the policies as violated. Exactly, yes. Well, where is the evidence in the record? How many people, besides Mr. Florence, have testified that their policies have been violated? We didn't even have to have people testify. They testified for us, meaning the officers. Every officer testified that we're not supposed to strip non-indictables, but we tell them to come in front of us, take off all your clothes, and bend over and squat. That's a strip. So the testimony that you marshaled from their own witnesses is that they regularly strip search, irrespective of what their policy says? Yes. Okay. Now, we know now that some circuits, in particular the 9th and the 11th, are beginning to or maybe beginning a trend away from the jurisprudence of other circuits that held that strip searching without reasonable suspicion is a violation of the due process rights, I guess rights of privacy of the individual. How do you answer that? I mean, how do you answer the 11th Circuit and the 9th Circuit? Okay, Your Honor, respectfully, it's privacy rights under the Fourth Amendment that they're violating, and the answer to your question is? Well, does somebody – that's an interesting question. Does somebody who is put in jail have a privacy right not to be searched, not to be strip searched? According to Bell, you do. According to our Constitution, you do, meaning Bell gave us – Bell was limited to post-contact searches. I think the court got that. The – Bell then went and said, and by the way, you know, we're not deciding anything else, just these post-contact, which it's a known fact, you know, that's the most planned opportunity to get smuggled in. Wait, wait, known fact? They only had one piece of evidence, one. Out of hundreds and hundreds of people, they had one balloon. That was it. The probability – but – in the sense that they focused on the absence of evidence to say, well, that proves the deterrence rationale. Your Honor – Aren't you damned if you do, damned if you don't, under the analytics employed by the majority in Bell? I don't think so. I think Bell was very limited. It was to the post-contact, and then they said, use these four factors, a balancing test. This is – we're talking about the Constitution, and there's different levels of scrutiny. There's different levels of people. And right now, we're talking about a very specific person at booking, a non-indictable person that comes in for violating a leash law, let's say. What's the fine? What is it? It's $50. Set aside Bell and talk about the 11th Circuit. All right. The panel, which is a big part of Burlington County's brief. Okay. And which seems like a perfectly reasonable decision. Tell us why it's wrong and why we shouldn't follow that decision. I think, just as Judge Rodriguez had pointed out, what Pell did is they started out with a sentence. Yes, this is egregious to strip search. It dehumanizes. But – and then they just leaped. They completely ignored the four factors that Bell gave us, the justification, and they just leaped right into, you know what? But the prison system can do whatever they want. It's their prison. They make the rules. That's not the way I see it. That's not what the majority of circuits see it. Prison is a dangerous place. And Powell says we're doing this to find contraband and for health reasons. Why isn't that persuasive, if you read it? They didn't – I've read it so many times and they just took a – I'm sure you have, but so have we. Yeah, yeah. They just – they took a leap. They didn't make any logic how they got there. They just basically came to the conclusion. It's a long opinion. Yes. And as I recall, I don't think there's any dissents. They started – That opinion. The 11th? Judge Barkett. Yeah, Barkett. There's one. There's 11 or one. Yeah, that's right. Yeah, go ahead. Powell just went right into let the prisons decide what to do. What's wrong with that? I mean, aren't we stepping into an area of the system that we really shouldn't be stepping into unless it's clear that it's unconstitutional? Isn't the general feeling that we should defer to prison administrators who deal with these issues on a day-to-day basis? We could defer, but we don't have to give them this absolute power to invade our constitutional rights, and I think the courts are the protectors of that. And we're not taking away any power from the prisons, no less. What we're asking as the plaintiffs is just enforce your rules that you already have and use reasonable suspicion for this certain group of people at this specific time of booking. Do you agree that anyone who has a drug background, there would be reasonable suspicion to strip search? You're going to say yes or no? I'm going to say yes if you have an answer. Yes. Okay. And if someone is in for a violent – or someone who has a background of suspicion, yeah, for your person. Yes, it may. So why shouldn't we remand to find out what the population is that's left? Like I think it's in your brief, the minister who was skimming off. It actually wasn't. I never really got that example. It's actually in theirs. Yeah. Well, he raised his hand. Yeah. I mean, I don't know how – I just don't think the record shows us how many people are affected by strip searches for – how many non-indictable crime prisoners are affected. It is in the record. It was submitted in disks to the lower court, and that's what they went on being. Yeah, they just didn't add it into their record. But knowing that – I understood the rules to say everything's pretty much out there. Yeah. Well, if it's – It was in the record. How many are there? Like 9,000 total from both of these people. Nine thousand over the – Non-indictables. Just non-indictables over the years. And counting – Over how many years? I think it's 2003 till – we only got till 2008, I think. They haven't updated them. And within those non-indictables, do we know how many have drugs in their background or violent crime? No, Your Honor, and let me explain the process because you were kind of asking that. What happens is when they – when someone gets arrested, there's like a rap sheet or – a sheet comes with them, and every – it's in the record. They testified to it, the officers. And even on Albert Florence's, at the top, it'll tell you what the charge is. His was a contempt, a civil contempt. But we're not talking about just the charge. Their background? Somebody may come in for a traffic violation, but if you look at his – what you call rap sheets, he may have five drug offenses. They have a computer system, and they could check. I think it's called CSC. But what I'm trying to find out is do we know how many people there are. If you exclude these that you concede, there would be reasonable suspicion to have drug backgrounds. Do we know what we're talking about in terms of numbers? And I think the answer is no. No, I don't think we even have to go there respectfully because when they're brought in on a certain charge, if you're brought in on a criminal contempt, they could check anyways on the thing, but they just admit anyhow that they have a blanket policy of stripping everybody that walks in. Let me follow up Judge Sloviter's question. You want to define your class as non-indictables. She's asking questions regarding distinctions within the category of non-indictables, right? Some may be dangerous people. Some may not be. Do you have the right to define the class, or does the prison have the right to define the class? It's an individual. The class is the individual's. It's an individualized suspicion basis. I don't think you understood my question. Who has the right to define who comprises the class, you or the prison? We do. So if you lost this case, could you come back with another case that says, let's say hypothetically we wrote an opinion that says among non-indictables include gang members, drug users, and those with a history of violent crime. Could you come back with the next case and say that your class now is non-indictables who are not members of those categories? Can you repeat that question? Sure. Sure. You've defined your class as non-indictables across the board. She doesn't have to lose it. Steve, if we were to send it back. Or if we sent it back. It's the same case. Let's say that this court – well, stick with my hypothetical for a minute. Okay, go ahead. I'm sorry. Let's say this court rules against you in this particular case, and the reason we rule against you is because within the category of non-indictables includes some people that this court concludes pose genuine security risks to the prison, violent people, gang members, et cetera. Are you with me? Yes. Okay. Then, in the next case, do you come forward with a new class of non-indictables that excludes those dangerous people? Theoretically, it can. Of course that can, Don. Because you have the power to define the class. In the prison, when they decide whom to search, you're going to continue to slice the onion however thinly you want to meet your class definition, and the prison has to live by your definition of the class. The court actually concludes what the class definition is. So the court came up with the final definition of this class. Are we going to slice the onion? I don't think it needs to be sliced because these people come in. The class is non-indictable, period. You're non-indictable. It gives them, the prisons, the power to then use their reasonable suspicion. They're trained guards. They know if somebody has a bulge in their pocket, then they could pat and frisk or go to the next level and do the strip. But they shouldn't be doing blanket strips on every non-indictable that walks in, regardless of whether they have a history of drugs or history. If I'm a gang member, gang members have rights too. They really do. If I'm a gang member and I came in on a traffic ticket violation, I'm there for a traffic ticket violation. Do they have to strip me? I'm on a non-indictable. They can look me up in their computer system and see if I have any violent crimes. That's their responsibility to do. They just won't do it. What if the guy on the traffic ticket has no priors but he's got 16 Mara Salvatrucha tattoos on him? Can they search him? Strip search him. Does that come to reasonable suspicion? What kind of tattoos? Mara Salvatrucha? What's that, a gang? Yeah. Maybe he's no more part of the gang. No, they're supposedly the toughest gang in Central and North America right now. I know these things change and different gangs vie for the toughest, but the MS, as far as I can tell right now, is the toughest. If I have a tattoo that looks like one of those and I'm not a gang member, we have rights. They could look at a tattoo and mine might look similar to one of the gangs, unbeknownst to me. Thank you. Your red light is on. You have two minutes, and we're going to keep you to the two minutes. You don't get two minutes. Can I just say one factual thing? You're not on the no. You can send us a letter if you want. Mr. D., you took time because we asked you a lot of questions, and you answered them in a very long way. So two minutes rebuttal. Keep that two minutes. Thank you, Your Honor.  We had a very long case this afternoon. Judge Hardiman just raised just but a few of the problems that happens when you start to distinguish classes of people who can be searched without reasonable suspicion and those among whom you need reasonable suspicion. And I would point the Court's attention, and rather than go into this at length, to Judge Kuczynski's concurring opinion in the Bull case, where he spends ten pages talking about the problems that attach to defining who can be searched and who can't be searched, whether it be reasonable suspicion or gang members or that. And he suggests to take this to the ludicrous extension would be to say that there are perhaps some people who can't be searched before going on an airplane. And he spends ten pages talking about how it will promote subjective decisions that can't be backed up. It will create mountains of paperwork so that you can justify your decision, so that a guy who probably has a high school degree can spit down and try and justify why his gut says this person should be searched and this shouldn't. He talks about the possibility of elitism and racism and profiling, entering into the determination of who's searched and who isn't. And that's why when you go back to it, you have to go back to Bell. You have to find that everyone needs to be searched. And, again, I would submit to the Court that the policy in Bell that the Supreme Court found to be constitutionally sufficient required not only the searching of people after contact visits, but that same policy then and today required the searching of everyone who goes into a federal penal institution. It has never been challenged since Bell. There have been no injunctive relief granted to stop that policy since Bell. And I would submit to you that as we stand here today, the law of the land, as submitted by the Supreme Court of the United States in Bell, is search them all when they come into the facility. It's what's required for safety. Thank you. Thank you very much. We will take the matter under advisement. Is Dr. McDevitt here? Is he still here from St. Joe's? No. Okay. Michael, we can't hear the next case at 1.30, obviously, so would you let them know? Maybe a quarter of two. Try a quarter of two. Maybe we'll finish. Okay. Thank you. Well, we're obviously not going to confirm.